FILED
U.S. DISTRICT COURT

RECEIVED CLERK

2008 JUL -8 P 3: 18

JUL 0 2 2008

U.S. DISTRICT COURT

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

Danny Lee Warner Jr.
USP #28341
P.O. Box 250
Draper, Utah   84020
Attorney Pro Se

IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| DANNY LEE WARNER JR., <br><br> Plaintiff, <br><br> v. <br><br> TOM PATTERSON, Ex. Director, for the Utah Department of Corrections; individually; <br> SCOTT CARVER, former Ex. Director, for the Utah Department of Corrections, individually; <br> STEVEN TURLEY, Warden at the Utah State Prison, individually; <br> CLINT FRIEL, former Warden at the Utah State Prison, individually; <br> COLLEEN GABBITAS, Deputy Warden at the Utah State Prison, individually; <br> BELLE BROUGH, Division Operator at the Utah State Prison, individually; <br> DAVID WORTHINGTON, Division Director at the Utah State Prison, individually; <br> ROGER BURNETTE, Captain-Religious Services, at the Utah State Prison, individually; <br> JEFF KOEHLER, Lieutenant-Religious Services, at the Utah State Prison, individually; <br> ANNA LEE CARLSON, Property Supervisor at the Utah State Prison, individually; | Case: 2:08cv00519 <br> Assigned To : Campbell, Tena <br> Assign. Date : 7/8/2008 <br> Description: Warner Jr. v. Patterson et al <br><br><br> CIVIL RIGHTS COMPLAINT |

1

BILLIE CASPER, Grievance Coordinator        )
at the Utah State Prison, individually;      )
TOM ANDERSON, Administrator at the          )
Utah State Prison, individually;             )
CRAIG BALLS, Hearing Administrator at       )
Utah State Prison, individually;             )
JOHN DOES 14-18, employees at               )
Utah State Prison, individually,             )
                                             )
              Defendants.                    )

## JURISDICTION

1.      Danny Lee Warner Jr.,   is a citizen of Utah, who presently resides at the Utah

State Prison, P.O. Box 250, Draper, Utah.

2.      Defendant Tom Patterson  is a citizen of Utah, and is employed as the Executive

Director at the Utah Department of Corrections.   At the time the claim(s) alleged in this

complaint arose, this Defendant was acting under color of state law in that he is the Executive

Director he is directly responsible for the continued religious discrimination being perpetrated at

the Utah State Prison.

3.      Defendant Scott Carver, is a citizen of Utah, and was employed as the Executive

Director for the Utah Department of Corrections.   At the time the claim(s) alleged in this

complaint arose, this Defendant was acting under color of state law in that he was the Executive

Director he was directly responsible for the discriminatory practices of the Utah State Prison and

even after being made aware of their unconstitutional nature was deliberately indifferent to Plaintiff's rights.

4.     Defendant Steven Turley, is a citizen of Utah and is employed as the Warden at the Utah State Prison.   At the time this complaint arose, this Defendant was acting under color of state law in that, as Warden, he is directly responsible for continuing the religious discrimination a the Utah State Prison.

5.     Defendant Clint Friel, is a citizen of Utah and was employed as the Warden at the Utah State Prison.   At the time this complaint arose, this Defendant was acting under color of state law in that, as Warden, he was directly responsible for implementing discrimination policies and even after being made aware of their unconstitutional nature was deliberately indifferent to Plaintiff's rights.

6.     Defendant Colleen Gabbitas, is a citizen of Utah and is employed as the Deputy Warden at the Utah State Prison.   At the time this complaint arose this Defendant was acting under color of state law, in that, as Deputy Warden of management services she was directly responsible for implementing discriminatory policies denying proper religious accommodation and had more than one opportunity to correct the wrongs being perpetrated, yet chose to be deliberately indifferent instead.

7.     Defendant Belle Brough, is a citizen of Utah and is employed as Director of Institutional Operations.   At the time this complaint arose this Defendant was acting under the color of state law, in that, as Director of DIO she was directly responsible for religious

3

discrimination and even after being informed of Plaintiff's plight continued to deny him proper accommodations, remaining deliberately indifferent to the religious needs of all rights of Plaintiff.

8.      Defendant David Worthington, is a citizen of Utah and is employed as the Division Director, Division of Institutional Operations.   At the time this complaint arose this Defendant was acting under color of state law, in that, as the Division Director of the DIO he was directly responsible for implementing discriminatory policies denying proper religious accommodation and could have put a stop to them, but chose to remain deliberately indifferent instead.

9.      Defendant Roger Burnette, is a citizen of Utah and is employed as a Captain, Volunteer & Religious Services at the Utah State Prison.   At the time this complaint arose this Defendant was acting under color of state law, in that, as the Captain, Volunteer & Religious Services he is directly responsible for religious discrimination at Utah State Prison and had numerous opportunities to put a stop to the policies denying proper accommodations to Plaintiff, yet chose to remain deliberately indifferent instead.

10.     Defendant Jeff Koehler, is a citizen of Utah and is employed as a Lieutenant, Volunteer & Religious Services at the Utah State Prison.   At the time this complaint arose this Defendant was acting under color of state law, in that, as a Lieutenant of Volunteer and Religious Services acted in a malicious and deliberately indifferent manner regarding the religious rights of Plaintiff.

4

11.    Defendant Anna Lee Carlson, is a citizen of Utah and is employed as the Supervisor of Property Unit at the Utah State Prison.    At the time this complaint arose this Defendant was working under color of state law, in that, as the Supervisor of the Property Unit she acted in a malicious and deliberately indifferent manner regarding the religious rights of Plaintiff.

12.    Defendant Billie Casper, is a citizen of Utah and is employed as the Grievance Coordinator at the Utah State Prison.    At the time this complaint arose this Defendant was acting under color of state law, in that, as the grievance coordinator she could have resolved every issue in this complaint, ending the religious discrimination at the Utah State Prison, yet chose to remain deliberately indifferent to the rights of Plaintiff.

13.    Defendant Tom Anderson, is a citizen of Utah and is employed as a Correctional Administrator for the Hearing Office at the Utah State Prison.    At the time this complaint arose this Defendant was working under color of state law, in that, as a Correctional Administrator for the Hearing Office he was directly responsible for the final administrative review of grievances for the Utah Department of Corrections and could have on several occasions put a stop to the religious discrimination faced by Plaintiff by appropriately interpreting the constitutional and applicable law, yet chose to remain deliberately indifferent instead.

14.    Defendant Craig Balls, is a citizen of Utah and is employed as a Correctional Administrator for the Hearing Office at the Utah State Prison.    At the time this complaint arose this Defendant was acting under color of state law, in that, as a Correctional Administrator he

5

was directly responsible for the final administrative review of grievances for the Utah Department of Corrections and could have on several occasions put a stop to the religious discrimination faced by Plaintiff by appropriately interpreting the Constitution and applicable law, yet chose to remain deliberately indifferent instead.

15.    Fourteenth through Eighteenth Defendant, John/Jane Does are citizens of Utah and whose true names are unknown and when true names are ascertained the pleadings will be amended accordingly, though all are employed by the Utah Department of Corrections and are directly responsible for the religious discrimination faced by Plaintiff.

16.    All Defendants acted under the color of state law at the time the claims in this complaint occurred and many continue to perpetuate the religious discrimination.

17.    Each Defendant is sued individually as well as his or her official capacity. Jurisdiction is invoked pursuant to 42 U.S.C. §1983; 28 U.S.C. §1331 & §1343.

18.    Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Section 2283& 2284 and Rule 65 of the Federal Rules of Civil Procedure.    Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. Section 2201 & 2202.

## B. NATURE OF CASE

19.    Plaintiff is an adherent of Odhvegr (Path of ODH) sometimes referred to as Odinism and/or Asatru and is being denied the religious items as well as other accommodations necessary to properly practice his religion.    Defendants have acted with malicious intent and deliberate indifference to the constitutional rights of the Plaintiff as well as currently established

6

law by denying the right to properly practice his religion.   With regards to Plaintiff the religious discrimination began December 2, 1998 and has continued to the present increasingly.

## C. CAUSE OF ACTION

## COUNT I:  VIOLATION OF FOURTEENTH AMENDMENT TO DUE PROCESS.

20.     In March, 2005, Plaintiff had a  ½" in total diameter  Silver Thorshammer taken from him and was subsequently forced to release it through the property unit.   At the time the Utah State Prison recognized that the Thorshammer was and is integral to the practice of Odinism/Asatru.   However, a policy was written banning metallic religious medallions (while still allowing metal wedding rings) and subsequently enforced with no notice to inmates of the policy change.  Thereby, denying Plaintiff due process.   Plaintiff challenged the rule and was told he must obtain a "plastic" Thorshammer.    Which does not and could not exist as the Thorshammer must be made of natural substance connected to the Earth.   After carefully explaining this, Defendants Casper, Anderson, Friel and Balls continued to maintain that Plaintiff must obtain a "plastic" Thorshammer.   Later, Plaintiff learned that the policy in question, in fact, stated that inmates must obtain a "non-metallic religious medallion" not one made of plastic as Defendants asserted, demonstrating their collective malicious intent and callous indifference in denying due process to Plaintiff's right to properly practice his religion.

21.     On April 18, 2005, Defendants Casper, Anderson and Friel suggested Plaintiff "should contact the Religious Program Office to purchase a plastic Thorshammer."

7

22.     In a memo dated April 29, 2005, Defendant Burnette informed Plaintiff that "religious symbols must be non-metallic", not plastic as Defendants claimed.

23.     On May 24, 2005, Defendant Balls again suggested Plaintiff, "replace" his Thorshammer "with a plastic symbol" which demonstrates the collective disregard Defendants have for due process as the right of Plaintiff to properly practice his religion.

24.     In May 2006, Plaintiff again had his Thorshammer taken from him. This time, a wooden one that he was forced to send out through the property unit. Once more without due process.   Defendants Casper and Friel asserted on August 17, 2006 that "the department" hd determined that inmates in short-term intensive management "not be allowed a religious symbol". Implying that religious practice is a privilege dependant upon an inmate's behavior. Again, this was done without due process.     Defendant Anderson upheld the department positions and his familiarity with Cutter v. Wilkinson, 544 U.S. 709; 125 S.Ct. 2113 at the time of this incident demonstrates that he was aware of "clearly established law", which means his intent was obviously malicious and he was deliberately indifferent to the rights of Plaintiff.

25.     On June 14, 2006, Plaintiff was informed by the Offender Management Review Committee that he could only obtain a Thorshammer after he had gained a privilege level that allowed property contracts. Blatantly indicating that religious practice and accommodation are based upon behavior. Thus, a privilege, not a right. At no time was Plaintiff given due process, despite Defendants knowingly violating his rights. All of this was done while Defendant Carver was Executive Director of the UDC.

8

**COUNT II:** **VIOLATION OF FIRST AMENDMENT RIGHT TO RELIGIOUS PRACTICE**

26. In March, 2005, Plaintiff had a Sliver Thorshammer taken from him and was forced to release it through the property unit. The Thorshammer is known to be integral to Odinist and Asatru Practice, especially in solitary adherents. Defendants Casper, Anderson, Friel and Balls (in a addition to other unnamed UDC employees) conspired to prevent the free exercise of Plaintiff's religious by allowing this to continue as did Defendant Burnette.

27. In May, 2006, Plaintiff again had a Thorshammer taken from him. This time a wooden one and was once more forced to release it through the property unit. Again, this denied Plaintiff's right to free exercise of his religion and Defendants Casper and Friel supported the denial of Plaintiff's religious rights. Defendant Anderson upheld the departments position instead of the law and his familiarity with Cutter v. Wilkinson. At the time of the incident demonstrates that he was aware of clearly established law, which means his intent was obviously malicious and he was deliberately indifferent to Plaintiff's religious rights.

28. On June 14, 2006, Plaintiff was informed by the Offender Management Review Committee that he could only obtain a Thorshammer after he had gained a privilege level that allowed property contracts. Blatantly indicating that religious practice and accommodation are based upon behavior. Thus, a privilege, not a right. This violates Plaintiff's right to freely practice his religion and Defendants Casper, Friel and Anderson knowingly supported this violation.

9

29.     All of this was done while Defendant Carver was Executive Director of the UDC and continues under Defendant Patterson.

## COUNT III: **VIOLATION OF FIRST AMENDMENT RIGHT TO RELIGIOUS PRACTICE.**

30.     Plaintiff repeatedly requested a set of Runes, made of wood so that he may properly practice his religion.   The Runes are the most important of all the personal ritual tools for a Odinist or Asatruar as can be clearly demonstrated by the "Poetic Edda" considered the most sacred text in Plaintiff's religion (refer to Havamal 138-139 and Havamal 142-144, among other sources).   The requests were all denied (most notably, April 29, 2005, June 24,2005 and August 15, 2005) and when Plaintiff challenged the denials he was told Defendant Friel had banned Runes form the institution for "safety and security reasons".   Plaintiff then appealed this response on August 3, 2005, requesting an explanation of how the ban was reasonably related to a penological interest per Turner v. Safely and RLUIPA, and was told "a comprehensive list of the reasons why will not be provided because I do not want to give you any ideas you do not already have", by Defendant Casper, who was supported by Defendants Anderson and Friel.   At the final administrative level, Defendant Balls again claims the Runes pose a "safety and security risk to the institution".   Without any supporting facts or valid penological reason then goes on to say that Plaintiff's claim regarding Cutter v Wilkinson, (a Supreme Court case) is not binding in the Tenth District, demonstrating not only a complete lack of competence but deliberate indifference to Plaintiff's constitutional right to freely practice his religion.

10

31.    All of this was done while Defendant Carver was Executive Director of the UDC
and continues under Defendant Patterson.

## COUNT IV:  VIOLATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL
PROTECTION UNDER THE LAW.

32.    Plaintiff repeatedly requested a set of wooden Runes with which to practice his
religion properly with and was denied on several occasions as asserted in Count III> Plaintiff
contends that Native American Inmates are allowed to obtain a medicine bag containing various
sacred items including but not limited to feathers, stones, pieces of wood, plant/herbs and other
such things as may be considered Holy by the individual wearing a Medicine Bag.  While Runes
are being denied which violates Plaintiff's right to equal protection under the law.  Runes are as
sacred to Plaintiff's religion as the Medicine Bag is to Native American Spirituality and both are
comparative in size, structure use and material, so that Defendants ban indicates a malicious
intent and deliberate indifference rather than a valid penological interest.

33.    The ban of Runes and violation of the Fourteenth Amendment was undertaken
while Defendant Carver was Executive Director of the UDC and continues under Defendant
Patterson.

## COUNT V: VIOLATION OF FOURTEENTH AMENDMENT right RET TO DUE PROCESS
OF LAW.

34    Plaintiff repeatedly requested a set of wooden Runes with which to practice his
religion properly with and was denied on several occasions as asserted in Count III.    Plaintiff
contends that he has never received due process in his denial of the Runes by Defendants and at

11

no time have Defendants demonstrated how a ban on Runes is reasonably related to a penological interest. Nor, have they attempted a less restrictive compromise.

35.    This lack of due process was undertaken while Defendant Carver was Executive Director of UDC and continues under Defendant Patterson.

## COUNT VI: VIOLATION OF FIRST AMENDMENT RIGHT TO FREELY PRACTICE RELIGION.

36.    Plaintiff asserts that he requested natural fruit juice as a substitute for Mead on numerous occasions to utilize during Blot (ritual) and was repeatedly denied. Plaintiff's religion calls for the use of Mead to honor Gods, Goddesses, and ancestors during sacred rituals. However, as alcoholic beverages are not allowed in a prison setting, Plaintiff suggested natural fruit juice as a alternative (accepted by all Odinist and Asatru Groups) but was denied by Defendants Burnette, Casper, Friel and Anderson between August 1, 2005 and October 16, 2006. This Religious need is still being denied which demonstrates Defendants deliberate indifference.

37.    All of this occurred while Defendant Carver was Executive Director of UDC and continues under Defendant Patterson.

## COUNT VII: VIOLATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION UNDER THE LAW.

38.    Plaintiff asserts that he repeatedly requested natural fruit juice to properly practice his religion as noted in Count VI and was continually denied while the Utah State Prison offered Jewish inmates Kosher food, Muslim inmates dietary supplements during the month of Ramadan, Vegan inmates alternative to meat products, among others. Which violates the equal

12

protection clause of the Fourteenth amendment. This violation occurred while Defendant Carver was Executive Director and continues under Defendant Patterson.

## COUNT VIII:   VIOLATION OF FIRST AMENDMENT RIGHT TO FREE SPEECH AND FREE EXERCISE

39.     Plaintiff asserts that numerous religious books and publications have been denied in violation of the First Amendment.    On April 4, 2006, Defendant Friel released a memo placing a "blanket ban" on all publications from National VanGuard Press, which is illegal itself; Plaintiff had ordered a religious book from National VanGuard Press on March 28, 2006 (prior to Defendants Friel's memo) and this book was later denied and Plaintiff lost the price of the book as it was not refundable.    Defendants Carlson, Casper, Friel and Anderson were all parties to this incident.

40.     In addition, all publications (including religious ones) are denied to inmates in Short Term Intensive Management in violation of the First Amendment.

41.     These violations occurred while Defendant Carver was Executive Director of the UDC and continues under Defendant Patterson.

## COUNT IX:   VIOLATION OF FIRST AMENDMENT RIGHT TO FREELY  PRACTICE RELIGION.

42.     Plaintiff asserts that he requested a Prayer/Altar Cloth and Wooden Bowli (bowl) for use in Blot (ritual) but was denied, despite their importance in the actual practice of Plaintiff's religion. Defendants Koehler, Friel and Anderson were all directly responsible for violations of Plaintiff's First Amendment Rights.

13

43. These violations occurred while Defendant Carver was Executive Director of the UDC and continues under Defendant Patterson.

## COUNT X: VIOLATION OF FIRST AMENDMENT RIGHT TO FREELY PRACTICE RELIGION.

44. Plaintiff has repeatedly requested religious dietary accommodations during the Winter Nights period, lasting between the Autumnal Equinox and the first Saturday between October 11th and 17th and has been alternately granted and denied such accommodations. Though never actually given it. Plaintiff's religion calls for a complete fast until after dusk each day of the Winter Nights which means he cannot eat during daylight hours when meals are regularly served at the USP. Plaintiff requested "Break the Fast Boxes" for each night of the Winter Nights period, but was only given one for the first night of Winter Nights in 2007. (never at all prior to this) which is not properly accommodating Plaintiff's religious practice. Plaintiff challenged the denial with an emergency grievance on September 1, 2006 attaching an explanation of Winter Nights from a Religious Group active in the community, yet did not receive a response until September 29, 2006 (not only after Winter Nights had already begun, but also in complete disregard for the emergency nature of the issue in that Plaintiff was losing something he could never get back) which said in part, "once we learn from officials of the Asatru Faith that it (Winter Nights) is a requirement that this celebration be recognized. An accommodation may be able to be made for it in the future." This reply came from Defendant Koehler. However, Plaintiff has a copy of an e-mail dated September 18, 2006, from Defendant

14

Koehler to "asatru@consultant.com" Which asked the question, " I'm interested to find out if there are any feasts or fasts that are required to be held by those of the Asatru Faith." The response from the Godni (priest) of the Heathen Spirit Hearth, dated September 21, 2006, clearly expressed the importance of the Winter Nights fast and feast to Defendants Koehler. Which demonstrates both Defendant deliberate indifference to the religious needs of Plaintiff. As well as his willingness to lie blatantly for his own and the USP's ends.

45. Plaintiff appealed the issue outlining the needs for dietary accommodations during Winter Nights and though the grievance was originally filed as a emergency, did not receive a reply from Defendants Casper and Friel until November 1, 2006 (a full 60 days after submitting it as an emergency) which said, "the department will make a diligent effort to resolve this issue with you before the next Winter Nights". Plaintiff accepted this a s progress towards a resolution and appealed to the final administrative level only asking for a Guarantee that Odinist and Asatru inmates "be able to uphold the Winter Nights fast and feast with proper accommodation from the prison each year". Plaintiff added that if inmates who follow Odhvegr (Odinism) and Asatru "are not given the proper accommodation for this religious celebration then the issue of discrimination and inequality stand." To which Defendant Anderson replied: "based upon your representations at Level Three I consider this grievance to be resolved pending certain actions on the part of the Department". Plaintiff was never given a response after this despite repeated requests and the next year prior to Winter Nights beginning requested dietary accommodation per policy, and was told only the first night of Winter Nights

15

(Autumnal Equinox) would be honored with a "break the fast" box.  Plaintiff again filed a emergency grievance on August 7, 2007 and received a response from Defendants Koehler on August 30, 2007 stating that the Winter Nights period of fast would not be accommodated. Thus, Plaintiff was denied his First Amendment right to properly practice his religion.

46.     It should also be noted that the USP offers "Break the Fast" boxes to Odinist and Asatru inmates for nine sacred days throughout the year as well as a number of other faiths for religious dietary accommodation.  Including Muslim inmates during Ramadan, which shows the malicious intent and deliberate indifference of Defendants.

47.     These violation occurred while Defendant Carver was Executive Director of the UDC and continue under Defendant Patterson.

**COUNT XI:  <u>VIOLATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION UNDER THE LAW.</u>**

48.     Plaintiff asserts that he repeatedly requested religious dietary accommodation for the Winter Nights fast as outlined in Count X, but was denied.  On August 1, 2005, Defendants Burnette sent Plaintiff a memo that states in part: "the Islamic inmates may request a basic boxed meal to be eaten after sunset during the fast of Ramadan.  In the boxed meal, there are no special food items.  This type of service can be provided for you should the need arise" this is the exact dietary accommodation Plaintiff requested and was denied by Defendants Koehler, Casper, Friel and Anderson, among others, after being told Winter Nights would be properly accommodated. The fact that Islamic inmates are accommodated during the entire month of Ramadan, but

16

Plaintiff was denied the same accommondation for the Winter Nights period is a blatant violation of the Fourteenth Amendment right to equal protection and demonstrates Defendants disregard and deliberate indifference for the Religious needs of Plaintiff.

49.     These violations occurred while Defendant Carver was Executive Director of the UDC and continues under Defendant Patterson.

## COUNT XII: <u>VIOLATION OF FIRST AMENDMENT RIGHT TO FREELY PRACTICE RELIGION.</u>

50.     Plaintiff asserts that on November 3, 2006, he received a packet entitled, "Religious Accommodation for Incarcerated Asatruar (Information for Prison Administrators)". Which outlines clearly the fundamental beliefs of Plaintiff's religion.  Proper Accommodations for Incarcerated Practitioners, as well as the Established Law Governing the Religious Practice of Incarcerated Odinists and Asatruar (See Exhibit A).  Which he made copies of and sent to Defendants Carver, Friel, Burnette and Brough, with a signed notarized letter asking that it be considered essential to the UDC and U.S.P.'s understanding of Plaintiff's religion and utilized as the foundation from which compromise could be reached that would balance Plaintiff's religious needs and governmental interests.   At no time did Defendant Carver respond, nor address Plaintiff's concerns in any way.  Nor has his successor, Defendant Patterson, Defendants Friel had an underling, Defendant Gabbitas, reply and supported her responses in which Plaintiff was told he could "use a personal towel for an Altar Cloth" (though inmates are not allowed to alter state or personal belongings which would have been necessary to make a proper Altar Cloth).

17

"Purchase a plastic Bowl" for religious services (though Plaintiff had made quite clear, as did the packet of information included, that the Bowli must be wooden) and insists twice that Plaintiff must obtain a "plastic religious symbol", though it had already been determined, prior to this that religious medallions had to be non-metallic, not plastic. At no time, does she address any other issue contained in the packet of information (Exhibit A) nor any of Plaintiffs many concerns. On January 24, 2007 Defendants Koehler sent Plaintiff a memo stating, "concerning your letter to Captain Burnett (sic) regarding the 'religious accommodation for incarcerated Asatruar' packet, you should be receiving a response from Religion Services soon." Yet, never did Plaintiff receive anything further from Defendants Koehler or Burnette regarding the letter or packet, nor did they address Plaintiff's many concerns regarding religious accommodation. Defendant Brough had her underling, Defendant Worthington reply to Plaintiff's letter and all he did was revisit past grievances submitted by Plaintiff regarding religious issues. At no time did Defendants Brough or Worthington address Plaintiff's many concerns, nor the packet of information he had included outlining proper accommodations for Plaintiff's religion. All of this demonstrates the malicious intent and deliberate indifference of Plaintiff's First amendment right to freely practice his religion by Defendants Carver, Friel, Gabbitas, Burnette, Koehler, Brough and Worthington.

51.    After challenging this issue asking Defendants to uphold the packet (exhibit A) Plaintiff received a response from Defendants Casper and Friel stating, "Religious Services are reviewing the packet and will communicate with your regarding holidays, food and religious

18

items."   At no time did this ever occur, nor did Religious Services ever communicate with Plaintiff about his many religious concerns.   Plaintiff had appealed this response to the final administrative level only asking that religious services follow up as promised and communicate with him.   Adding that each issue be addressed separately so that both sides would be clear about what would be approved and what would not.   Plaintiff clearly stated that the issues needing to be addressed were the "9 Holy Days, 9 Sacred Items, and Six other issues (namely a plot of land for ritual use, study time for Asatruar, a Religious Library for donated Asatru Books/Publications from non-profit organizations, and Asatruar being allowed to Blot and Wassail together with out a Volunteer)".   Though these issues were not addressed and still remain relevant to proper religious practice for Plaintiff.   In response Defendant Anderson replied, "once you are made aware of the determination by Religious Services, concerning the information you provided you are at liberty to challenge those decisions through the grievance system if you wish".   As previously noted Plaintiff never received any response or determination from religious services and proceeded to file another grievance in the hopes of having the issues resolved to the satisfaction of both parties.   Defendant Koehler did nothing but reiterate the departments position, not addressing anything not discussed previously, let alone considering the packet "Religious Accommodation for Incarcerated Asatruar" and Defendant Gabbitas does no better at level two, which clearly demonstrates Defendants malicious intent and deliberate indifference to the religious needs of Plaintiff.

19

52.     It should also be noted that while two prominent organizations (Heathen Spirit Hearth and Heathen Hof of Godhead) prepared the packet in question.  Other organizations have contacted prison administrators and chaplains regarding the religious needs of Plaintiff and other Odinist and Asatru inmates.   Most notably, Northern Way Asatru Ministries who sent a packet of information (See Exhibit B) similar to Exhibit A, as well as the Holy Nation of Odin who attempted to open a dialogue with Defendant Burnette, to no avail.

53.     At the time of these violations Defendant Carver was Executive Director of the UDC and they continue under Defendant Patterson.

**COUNT XIII:     VIOLATION OF RLUIPA**

54.     Plaintiff asserts that each of the events described in Count I through XII also violates the RLUIPA and that all Defendants named knew or should have known that law was clearly established regarding Plaintiff's religious rights.   Thus, they were deliberately indifferent to said rights.

**INJURY**

55.     Plaintiff asserts that he has suffered significant spiritual damage due to Defendants malicious intent and deliberate indifference to his religious needs and continues to suffer injury to his eternal soul by being denied the ability to properly practice his religion. Plaintiff further asserts that his place in the afterlife is no longer secure due to his inability to live his convictions by properly upholding those practices he considers sacred and imperative to achieving a prominent place in the next life because of Defendants callous indifference to

20

Plaintiff's religious beliefs. Plaintiff contends that the spiritual injury he has suffered is worse than any physical, mental or emotional damage could ever hope to be. As his soul is permanently injured and continues to suffer at the hands of Defendants.

56. In addition to spiritual injury Plaintiff asserts that in denying his ability to wear an appropriate Thorshammer, Defendants have harmed him emotionally and mentally in that the Thorshammer is believed to contain the Megin (strength) of Midgardh (the earth) which wards off the Etins (Chaos) of the world.. Without this protection Chaos is allowed to run rampant in Plaintiff's life.

57. Furthermore, in denying Plaintiff Runes, Defendants are severely limiting Plaintiff's ability to communicate with Gods, Goddesses, Norns, and Ancestors, which is essential for spiritual guidance and needed to lead a noble and honorable life. This denial has had a significant impact on the mental and emotional state throughout the entire time he has been without the Runes.

58. Refusing to properly accommodate Plaintiff during he entire period of Winter Nights has caused physical as well as mental and emotional damage. As he was denied the proper nutrition to sustain himself for almost three weeks by Defendants deliberate indifference.

59. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described in this complaint. Plaintiff has been and will continue to be irreparably injured by the conduct of the Defendants unless this court grants the declaratory and injunctive as well as other relief Plaintiff seeks.

21

## D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

60. Plaintiff has not filed any other law suits in state or federal court dealing with the same facts involved in this action.

61. Plaintiff has filed institutional grievances for each and every issue raised in this complaint seeking both informal as well as formal relief from the appropriate administrative officials and sought religious accommodation several times only to meet with intolerance and indifference. At every stage, administrative remedies have been exhausted

## E. REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a. A declaration that the acts and omissions described herein violated Plaintiff's rights under the constitution and laws of the United States.

b. A preliminary and permanent injunction ordering Defendants Patterson, Turley, et al., currently in positions of authority over the Utah State Prison and its inhabitants, as well as all future employees of the Department of Corrections of Utah, to properly accommodate the practices of Odhvegr (also known as Odinism or Asatru) namely by allowing personal Rune Sets, Thorshammer made of a natural substance, a sacred prayer/altar cloth, wooden Bowli, MeadHOrn (or appropriate substitute), Oath Ring, Sedhr/Mediation Drum,Gandr/Rune Staff, in addition to offering natural fruit juice on the nine Holy days requiring ritual observance, Pork for Yule, Accommodating the entire period of "Winter Nights" (extending from the Autumnal

22

Equinox to the first Saturday between October 11th and 17th, with "Break the Fast" boxes meeting the daily caloric requirement after dusk each day, study time each week in a group setting for a minimum of one hour, gathering to hold Blot (ritual) on the nine Holy Days, as well as other practices, items, etc., that may be necessary to properly practice Odhvegr (Asatru or Odinism).

c. Compensation damages in the amount of $1.00 per day from the start of the constitutional violation to resolution for each violation and every Defendant involved in the incident, denial, etc., jointly and severally.

d. Punitive damages in the amount of $1.00 per day from the start of the constitutional violation to resolution for each violation and every Defendant involved in the incident, denial, etc., jointly and severally.

e. A trial on all issues triable by law

f. That counsel be appointed to represent Plaintiff in this action, as well as attorney fees granted.

g. Grant Plaintiff all costs and fees associated with action.

h. Any additional relief the court deems just and proper.

DATED this _11th_ day of _June_____, 2008.

Danny Lee Warner
Plaintiff

23

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the plaintiff in the above action, that

he has read the above complaint and that the information contained therein is true and correct. 28

U.S.C. Sec. 1976.  18 U.S.C. Sec. 1621.

EXECUTED at _SL County_ on _June 11th_ , 2008.

Notary _[signature]_

Date  6-11-08

SCOTT SMITH
NOTARY PUBLIC ● STATE of UTAH
14425 BITTERBRUSH LANE
DRAPER UT 84020
MY COMMISSION EXPIRES 04-04-2009

24

My name is Laurel M. Owen. I am over twenty-one years old, of sound mind, capable of making this affidavit, and personally acquainted with the facts and subject matter herein.

I provide volunteer Odinist/ Asatru services for Texas Department of Criminal Justice and Arkansas Department of Corrections. I am a member of the Odinic Rite, an international Odinist organization. I am the senior advisor on prison matters for this group. I have provided services for the BOP and am a resource for several state systems. I have hands-on knowledge of the challenges, rewards, and benefits of prison work.

Regular meeting periods are scheduled for Odinist/ Asatru members throughout the federal system. They can meet with or without a sponsor. These meetings happen weekly. I suggest that monthly meetings, at the bare minimum, should be sanctioned with or without a free world sponsor. After these groups prove they are sincere and dedicated, the meetings should be weekly. Odinist volunteers are hard to come by and the Odinist population is growing in the prisons. Education and mature spiritual/emotional tools are known to effectively combat recidivism. If Odinist/Asatru members are forbidden to meet without a sponsor, their growth is hampered. In Montana, the chaplain sponsored a kindred himself. In the federal system, I have seen designated leaders from the prison population lead in the absence of a sponsor. This is done in Maryland, to name one. If a Wiccan volunteer conducts services in a prison that's fine for the Wiccans, not for the Odinist/Asatru. The differences between the two are significant enough to warrant separate services. If a Wiccan wants to sponsor an Odinist group, that's fine, perhaps they can let the Odinists hold a blot on the other side of the room. It does not work, however, to put Odinist/Asatru people in with the Wiccan services. It's like expecting Catholics to attend Southern Baptist services because they are all Christian.

Certain items should be officially sanctioned for individual observance. This list would include set of Runes, books about Runes, and a pendant with a symbol of our faith, such as a Thor's Hammer or a sun wheel, and access to books about Odinism/Asatru (see list for individual observance). A list of books can be obtained from the Odinic Rite. These are the bare necessities, and only for ad-seg or death row. We advocate that even if there is one Odinist/Asatru in population on a unit he or she should be able to have chapel time.

Once weekly services are granted, the prisoners should be able to obtain certain items for these services, to be kept in a box in the chaplain's office. This list includes:
A Hammer (This can be made of cardboard, wood, or be small enough not to be lethal) A Blessing Bowl (wood, ceramic, metal)
A sprig of evergreen
A drinking horn or mug
Enough apple or grape (or some other) juice
A set of 24 Runes
A Gandor (wood or cardboard)
An Oath Ring
An Altar Cloth
A Candle
Representations of Gods and Goddesses (up to 5 small statuettes)
A small piece of driftwood or a small stone (as this is an earth religion)
An altar block, if no small flat table is available
An outside sacred space

This list is not exhaustive. It's the beginning. I am prepared to discuss the reason and validity of each of these in a service. Having these items at the prisons would be helpful to volunteers like me so I would not have to lug around bottles of juice and tools. This will also assist Chaplains in obtaining the tools any Odinist group will need.

Runes are an integral part of our faith. Much like the Bible and the Koran, the Runes are a focus for meditation and spiritual guidance. Disallowing them is extreme, and must surely be the result of a lack of information. I have heard two reasons why Runes are forbidden. Let's look at these reasons and break them down.

A) "They will be used as gang communication." Well, gang communication comes in all forms, including personal letters and Bible versus. I have offered countless times to conduct a seminar for prison officials in the symbology and language of the Runes. Knowledge is the best tool for unlocking these foreign-looking letters. In allowing them and encouraging their study, the true nature of the Runes can be revealed -they are meditation tools, age-old symbols that can be used constructively and maturely in modern life. Disallowing them encourages misinformation on all sides. Disallowing them also sets up an atmosphere of secrecy that opens the door for misuse on every level. This is contrary to study and advancement. The Runes symbolize the cycles of the earth, the human psyche, and life passages. They tell the story of how our ancestors viewed and experienced this world. They have no more to do with the Aryan Brotherhood than the Scriptures do.

B) "They will be used to cast evil spells on people." Not one Rune carries any message that a child should be protected from. These are symbols, not inherently evil tools for psychotics. Psychotics are beyond the scope of my prison work and this affidavit. Nobody but a psychotic would cast evil spells on people. I can assure you our religion does not promote psychotic behavior.

C) "Runes could be used for betting." So could dominoes, but they aren't illegal. Anything could be used for betting. This is similar to the gang communication excuse; it's a cover for a lack of correct information about Runes, their meanings, and their uses.

In summation, I would like to say a couple of words about Odinism/Asatru. Every faith has a golden rule. In Odinism, we have the nine noble virtues. These are: Courage, Truth, Honor, Fidelity, Discipline, Hospitality, Industriousness, Self-Reliance, and Perseverance. These are good old-fashioned character traits our parents and grandparents tried to instill in us. These noble virtues can be harnessed and put into action to make a better person, no matter where he lives. A combination of regular meetings, knowledgeable leadership (whether that is a prisoner or a free world sponsor or a chaplain willing to ask questions and gather information), book study, meditation on the Runes, and monthly services can and do produce positive results. I have seen it happen. Odinism/Asatru has been described as a Folk Religion of Northern Europe and an Earth Religion. These are correct statements. We do not proselytize as we respect everyone's truth. In short, we promote family values and a strong sense of constructive individuality. There is no hidden agenda here. Odinism, properly practiced, is an asset to any prison system.

In witness whereof, I have set my hand on this 28 day of MAY, 2008.

Laurel M. Owen

Before me, the undersigned authority , on this day personally appeared _Laurel m Owen_ known to me to be the person whose name is subscribed to the foregoing instrument, and having been duly sworn on oath, acknowledged that she had executed the same for the purposes and consideration therein expressed and that the foregoing statements are true and correct.

Given my hand and Seal of Office on this 28 day of MAY 2008.

Notary Public

CARRIE PITTMAN    Notary Public
Carroll County    State of Arkansas
My Commission Expires July 5, 2011