# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| DANNY LEE WARNER, JR., <br><br> Plaintiff, <br><br> v. <br><br> TOM PATTERSON et al., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br><br> Case No. 2:08-CV-519 TC <br><br> District Judge Tena Campbell |

Plaintiff, Danny Lee Warner, Jr., an inmate at the Utah State Prison, filed this *pro se* civil rights suit under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2011). Plaintiff was allowed to proceed *in forma pauperis* under 28 U.S.C. § 1915. *See* 28 U.S.C.A. § 1915 (West 2011). On June 17, 2010, Defendants filed a *Martinez* Report (Dkt. no 44) addressing Plaintiff's allegations. Shortly thereafter, Defendants filed a motion for partial summary judgment on all claims except Count VIII of Plaintiff's Complaint (Doc. 55). After further discovery, including the deposition of Plaintiff, Defendants filed a separate motion for summary judgment on Count VIII. (Doc. 70.) Both motions are now fully briefed and are properly before the court.

## ANALYSIS

### I. Introduction

Plaintiff is an inmate in the custody of the Utah Department of Corrections (UDC) and an adherent of the Odhvegr religion, also known as Odinism or Asatru. Plaintiff's Complaint asserts claims under 42 U.S.C. § 1983, the First and Fourteenth Amendments, and the Religious

Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") based on alleged interference with his right to freely exercise his religion.  Plaintiff's Complaint lists thirteen separate counts, including allegations that Defendants infringed Plaintiff's religious rights by denying him: (1) a metal Thorshammer medallion; (2) a set of wooden runes and a wooden bowli; (3) dietary accommodations, including fruit juice or another suitable mead substitute and "break the fast boxes" for ritual fast days; (4) religious books and publications; (5) ritual items, including an altar cloth, meadhorn, oath ring, meditation drum and rune staff; and (6) group worship accommodations.  Plaintiff also asserts an Equal Protection claim based on the denial of certain accommodations that are allegedly provided to inmates of other religions.  Finally, Plaintiff asserts a Due Process claim under the Fourteenth Amendment based on Defendants' implementation of policies banning certain religious items without first notifying or seeking input from inmates.  Plaintiff's Complaint names Defendants in both their individual and official capacities and seeks declaratory and injunctive relief, compensatory and punitive damages, attorneys fees and costs.

Defendants move for summary judgment on each of Plaintiff's claims, asserting that they have lawfully accommodated Plaintiff's religious practices while taking into account Plaintiff's behavioral history, prison housing security classification, relevant policies, and other factors, including the nature of the requested materials, overall prison security, and the safety of inmates and staff.  Defendants further assert that even if Plaintiff could show a constitutional violation Defendants are entitled to qualified immunity because the rights at issue were not clearly established at the time of the alleged acts.

## II.  Material Facts[1]

1.  Plaintiff, Danny Lee Warner, Jr., is an inmate in the custody of the Utah Department of Corrections ("UDC").

2.  Since commitment to UDC custody in December, 1998, Plaintiff has been housed at UDC's prisons in Draper and Gunnison, Utah, except for medical infirmary stays and a parole period from September 25 to December 28, 2007.  While at the Utah State Prison ("USP") in Draper, Plaintiff has been housed primarily in the Uinta housing unit, a maximum security facility.  (Offender Location History, Doc. 47, Ex. 11-2.)

3.  Since 1999, Plaintiff has been involved in 59 disciplinary actions and found guilty of multiple incidents of: disorderly conduct/reckless endangerment (six), assault or battery (two), resisting arrest/move or refuse order (four), fighting/threats/horseplay (seven), possession of contraband (four) and "possession or use of drugs-tamper/refuse test" (three).  (Offender Discipline History, Doc. 47, Ex. 11-3.)

4.  After an assault and battery incident in February 25, 2005, Plaintiff was placed in Uinta 1 (maximum security) through May 25, 2005.  Metal objects are not allowed anywhere in Uinta 1.  (Anderson Decl. ¶ 4, Doc. 44-1); (Offender Location History, Doc. 47. Ex. 11-3.)

5.  Through mid-April of that period he was in Section 4, a short-term intensive

---

[1]  The material facts presented here are drawn from Defendants' Memorandum in Support of Motion for Partial Summary Judgment (Doc. 56) and Defendants' Memorandum in Support of Motion for Summary Judgment on Count VIII of the Complaint (Doc. 70).  Although Plaintiff has filed lengthy responses to Defendants' motions, supported by numerous declarations and exhibits, he has not directly responded to each of Defendants' assertions of fact.  Any genuine dispute as to the material facts presented here, however, is discussed herein.

management section where violent or otherwise unmanageable offenders are kept and where an inmate's personal property is severely restricted for safety and security reasons.  (Anderson Decl. ¶ 4, Doc. 44-1.)

6.  Section 4 is the prison's most secure housing section within the most secure housing unit (Uinta) in the UDC system.  It is a short-term intensive management section where violent or otherwise unmanageable, unpredictable offenders are moved from all UDC secure facilities. (Anderson Decl. ¶ 4, Doc. 44-1.)

7.  Because of this, inmates' personal property is severely restricted.  Any item that could be fashioned into a weapon or used for self-harm is not allowed until housing management has had time to monitor the inmate and make a determination as to the best housing option. Relinquishment of personal items back to an inmate depends on where he is moved.  (Anderson Decl. ¶ 4, Doc. 44-1.)

8.  Plaintiff was moved from Section 4 to the less restrictive Section 5 in Uinta 1. (Anderson Decl. ¶ 4, Doc. 44-1.)

9.  In a prison disciplinary hearing held on March 23, 2010, Plaintiff was found guilty of intoxication/possession of controlled substance based on a positive urine test for alcohol.  The urine sample was tested twice and came back positive for alcohol at the rate of .07/.02.  The urine screen lab concluded that medications would not cause positive results for alcohol.  (Burr Decl. ¶ 9, Doc. 44-3.)

10.  Since approximately April 15, 2010, Plaintiff has been housed in the Wasatch housing unit, a medium security facility at USP.  (Supp. Zeller Decl., Doc. 54, Ex 11-2a.)

**UDC Policies on Inmate Property**

11.  USP has a staff of approximately 120 UDC employees who oversee and implement a variety of programs, including inmate treatment, education, technical training and religious practices.  (Burr Decl. ¶ 3, Doc. 44-3.)

12.  Staff members at USP manage inmates under UDC policy FDr 20, "Privilege Level System," whose stated rationale is to "manage inmates in a manner which optimally promotes institution safety, security, management and control."  (UDC Policy FDr 20, Doc. 44-7.)

13.  Prison policies for inmate property and religious items vary according to security levels of the housing unit.  (Koehler Am. Decl. ¶ 23, Doc. 49.) (UDC Policy FDr20, Doc. 44-7.)

14.  The Inmate Property Matrix sets forth the types and amounts of personal property an inmate may possess at USP, depending on the inmate's security level.  (FDr14/12.00, Doc. 44-9.)

15.  Staff members at USP control inmate property under UDC policy FDr 14, "Inmate Property."  (Doc. 44-8.)

16.  Under that policy, inmates are allowed to have "one approved religious symbol in their possession."  The symbol must comply with the Inmate Property Matrix, with certain exceptions, including Native American eagle feather, prayer beads, rosary beads (plastic only); and neck chain (one only).  This policy also sets forth the methods, including request for approval for purchase, by which inmates can obtain a religious symbol.  (FDr14/02.11E.1, Doc. 44-8, p. 31.)

17.  Prison policy allows inmates one religious medallion, which can be a Thorshammer.

In intensive management, a Thorshammer is allowed if made of plastic; at other security levels, the medallion may be made of other materials, subject to approval by USP staff, taking into account prisoner behavior and security considerations.  (Koehler Am. Decl. ¶ 4, Doc. 49; Balls Decl. ¶¶5-6, Doc. 44-2.)

18.  In maximum security (Uinta 1), a metal Thorshammer or similar item is banned because it can be fashioned into a tool that could be used, for example, to unlock handcuffs. (Burr Decl. ¶ 4, Doc. 44-3.)

19.  While in short-term intensive management, an inmate is allowed only one non-metallic religious symbol and four soft-covered books, among other items.  (Policy FDr 25/03.08M, Doc. 44-10.)

20.  If the inmate is moved to long-term intensive management, he is allowed 10 books. (Policy FDr 25/04.05L, Doc. 44-10.)

21.  The rationale for restricting inmates' property in intensive managemnet is that inmates who have demonstrated certain behaviors, such as "threatening the safety, security or control of the institution" require appropriate management.  (Policy FDr 25/04.05L and FDr 25/01.04, Doc.44-10.)

22.  USP policy allows inmates to possess rune cards of a size and material, such as paper or plastic, similar to playing cards.  (Koehler Am. Decl. ¶ 25, Doc. 49.)

23.  Fruit juice is not given to inmates at USP because it can be fermented to create

6

alcohol, which is forbidden at USP.  USP officers have discovered alcohol numerous times in

inmates' sinks and toilets and hidden within inmates' clothing and in the gymnasium, locker

areas, and pool tables at USP.  (Balls Decl. ¶ 8, Doc. 44-2.)

     24.  Sugar-free punch is served at lunch as a substitute for fruit juice.  (Monson Decl. ¶ 3,

Doc. 44-5.)

     25.  Pork meats/products are not served in meals provided to inmates at USP because of

religious objections from inmates.  (Balls Decl. ¶ 9, Doc. 44-2.) (Monson Decl. ¶ 4, Doc. 44-5.)

     26.  Pork products, such as fully cooked bacon and pork ramen, are available for purchase

through the commissary.  (Monson Decl. ¶ 6, Doc. 44-5; UCI Commissary list, Doc. 44-12, p. 3.)

     27.  A fabric item such as a towel is available for purchase by inmates through the

commissary, and can be used by inmates as a prayer rug, altar cloth or for similar purposes.

(Koehler Am. Decl. ¶ 25, Doc. 49; UCI Commissary list, Doc. 44-12, p. 7.)

     28.  Inmates are allowed by UDC policy to possess up to ten books, unless in intensive

management for behavioral or other security issues.  Hard-backed books are not allowed in

maximum security.  (Talbot Decl. ¶ 4, Doc. 44-6.)

     29.  Books and other publications are inspected by USP staff upon receipt at the prison

and screened for inappropriate content which jeopardizes the safety or security of the institution.

The Wardens of Draper and Gunnison determine whether a publication is banned and the Mail

Unit within the Draper prison facility enforces such policy.  (Talbot Decl. ¶ 7, Doc. 44-6.)

     30.  Gathering of groups of inmates for religious worship or study is allowed at USP in

the chapel areas with an approved volunteer present.  Volunteers are not allowed in inmate

housing areas for reasons of volunteer safety and prison security.  (Burr Decl. ¶ 8, Doc. 44-3.)

31.  USP inmates who wish to fast during the day are provided "break-the-fast" food boxes upon 45 days written notice.  (Koehler Am. Decl. ¶ 16, Doc. 49; Monson Decl. ¶ 5, Doc. 44-5.)

32.  For the June 2010 Summer Solstice fast, Plaintiff was on the list for receipt of a break-the-fast box.  (Koehler Am. Decl. ¶ 26, Doc. 49.)

### Odinism and Warner's Requests for Accommodations

33.  Plaintiff is an adherent of the Asatru/Odinism religion.  (Complaint ¶ 19.)

34.  Odinism, or Asatru, is an ancient, Nordic paganism from pre-Christian Germanic culture and based on Norse mythology and mysticism.[2]

35.  Odinism is associated with a Nordic racialist ideology.  The Odinist movement has been described as "a spiritual rediscovery of the Aryan ancestral gods . . . intended to embed the white races in a sacred world view that supports their tribal feeling."

http://en.wikipedia.org/wiki/Germanic_Neopaganism#Odinism.

36.  Adherents to the religion strive to attain the "Nine Noble Virtues," which are described as courage, truth, honor, fidelity, discipline, hospitality, industriousness, self-reliance, and perseverance.  To attain these virtues, adherents must communicate with the ancient Norse gods and goddesses by studying runes, practicing rites on specified days of the week and

---

[2]  Incarcerated Odinists occasionally interchange the names of their religion between Odinism, Asatru, Wotan, and Wiccan. U.S. Department of Justice, Federal Bureau of Prisons, Inmate Religious Beliefs and Practices, Odinism/Asatru 11 (2002), http://www.nicic.org/pubs/2002/017613.pdf.

observing the major Odinist holidays.  *Id.*

37.  In Norse mythology, the runic alphabet has a divine origin and some Odinists use the runes as a tool for divination seeking to foresee the future or to be inspired by a god.  Other Odinists use runes in identifying powers available for growth, protection, and healing.  *Id.*

38.  The two main rituals are the Blot and the Sumbel.  On a daily basis, believers honor particular Norse gods, goddesses and ancestors at a small altar with a blessing bowl.  A bowli is a sacrificial bowl used to contain mead for the blessing or offering.  Blot is the historical Norse term for sacrifice or ritual slaughter and the Norse gods are worshiped by Odinists with a symbolic sacrifice/offering of mead, an alcoholic drink.  *Id.*

39.  Odinists may use a variety of personal items in practicing their religion, including a Thorshammer medallion and chain, which is an object of protection, fertility, and new life.  *Id.*

40.  A metal Thorshammer was taken from Plaintiff and sent to the prison property unit in March, 2005.  (Compl. ¶ 20, Doc. 5.)  This was done when Plaintiff was moved into the Uinta 1 housing unit, where metal items are not allowed for security reasons.  (Grievance response, Doc. 44-11 at 22.)

41.  Plaintiff alleges that his metal Thorshammer was ½ inch in diameter but fails to state the height or width of the object.  (Compl. ¶ 20.)

42.  UDC staff have observed deadly weapons made from metal objects in the 2-2.5 inch range with diameters between 1/8 and ½ inch.  They have also seen wood in the 2.5 x ½ inch range ground and sharpened into a stabbing type deadly weapon.  (Anderson Decl. ¶ 5; Talbot Decl. ¶ 3.)

43.  Hard plastic objects such as pens and toothbrushes have been used as weapons.
(Balls Decl. ¶ 5.)

44.  It is for those reasons that metal objects are not allowed in Uinta 1 and why nothing
made of a hard material is allowed in short term intensive management sections within Uinta 1.
(Anderson Decl. ¶ 5.)

45.  Plaintiff is allowed to wear a Thorshammer, which in maximum security must be
made of plastic.  (Koehler Am. Decl. ¶ 4, Doc. 49.)

46.  UDC staff have never seen a gold wedding band converted into a deadly weapon, or
any kind of weapon at USP.  (Anderson Decl. ¶ 5.)  Wooden items such as runes or bowls are not
allowed for security reasons.  UDC staff have observed USP inmates using pieces of wood on at
least 4 occasions to disable or circumvent door locks.  (Balls Decl. ¶ 7.)

47.  This has been done to make the doors appear to be locked so as to set a trap for an
officer.  (Burr Decl. ¶ 5.)

48.  Plastic bowls are available for purchase by inmates through the prison commissary.
(UCI Commissary List, Doc. 44-12, p. 7.)  A Native American prayer bag is allowed upon
application by an inmate and approval by UDC staff.  Worn on the neck like a religious
medallion, the bag may contain plant materials such as leaves or roots, along with small stones
(pea-sized or smaller).  (Burr Supp. Decl. ¶¶ 7-14, Doc. 48.)  Items so described are not
considered a safety or security risk at USP.  The contents are small enough to be poured onto a
handkerchief.  The prayer bags are subject to search at any time by corrections officers. (Burr
Supp. Decl. ¶¶ 10-16, Doc. 48.)

10

**Facts Regarding Count VIII of Complaint**

49.  Plaintiff currently resides in general population and wears a metal thorshammer. (Dep. of Danny Lee Warner, p. 14, lines 1-12; hereinafter cited in the format "14:1-12").

50.  Plaintiff currently has a wooden sunwheel, which is available for him to wear.  (19:8-17.)

51.  Plaintiff has a set of runes which he made himself (31:20) and are acceptable to him. (34:14-16.)

52.  Plaintiff has a small version of a rune staff which he made himself.  (129:18-23.)

53.  Plaintiff currently has all three religious texts he considers essential: the prose Edda, the poetic Edda, and the Heimskringle.  (35:18-39.)

54.  Plaintiff has access to milk and honey, which can be mixed as a substitute for mead and used in the "blot" ceremony.  (44:3-6.)

55.  Plaintiff currently has an oath ring (49:23-25) which is worn on his finger and is satisfactory to him.  (51:7-11.)

56.  Break-the-fast boxes "fast-boxes" are available to Plaintiff upon written request. (57:14-16.)

57.  Fasting is a personal choice of Plaintiff and others, but is not required of Odinists. (59:8-13.)

58.  Pork products are available to Plaintiff through the prison commissary, and are acceptable to him.  (69:13-22.)

59.  Plaintiff ordered a book entitled "Gods and Myths of Northern Europe," by H. R.

11

Ellis Davidson, from National Vanguard Press, which he acknowledged "had some racist publications that they offer, as well."  (89:14-22; 90:15-91:2.)

60.  Denied publications are returned to sender.  (UDC Level II grievance response, Casper/Friel letter dated October 16. 2006: Exhibit 2, p. 4.)

61.  Plaintiff wrote the publisher for a refund of the book's cost of $14.88, but never received a response.  (92:10-14.)

62.  "Gods and Myths of Northern Europe" is available for Plaintiff to purchase through Utah Correctional Industries (UCI) or Barnes and Noble.  (UDC Level III grievance response, Anderson letter dated 23 January 2007: Exhibit 2, page 1.)

### III.  Summary Judgement Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," *Cellotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986), thus, "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Cellotex*, 477 U.S. at 325.  This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of*

*Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998).  Once the moving party satisfies its initial

burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish

that there is a genuine issue of material fact regarding the existence of [the disputed] element."

*Id.*  A fact in dispute is "material" only if it might affect the outcome of the suit under governing

law.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  The dispute is "genuine" if the

evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

      A nonmovant "that would bear the burden of persuasion at trial" must "go beyond the

pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial

from which a rational trier of fact could find for the nonmovant."  *Adler v. Wal-Mart Stores*, 144

F.3d 664, 671 (10th Cir. 1998).  Mere allegations and references to the pleadings will not suffice,

instead, the specific facts put forth by the nonmovant "must be identified by reference to an

affidavit, a deposition transcript or a specific exhibit incorporated therein."  *Thomas v. Wichita

Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992).  Moreover, "the nonmovant's

affidavits must be based upon personal knowledge and set forth facts that would be admissible in

evidence; conclusory and self-serving affidavits are not sufficient."  *Hall v. Bellmon*, 935 F.2d

1106, 1111 (10th Cir .1991).  The court must "examine the factual record and reasonable

inferences therefrom in the light most favorable to the party opposing the motion."  *Lopez v.

LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).  Conclusory allegations are given no weight, and

"[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position

will be insufficient" to overcome a summary judgment motion.  *Anderson*, 477 U.S. at 249, 252.

13

## IV.  Legal Standards for Prisoner Free Exercise Claims

### a.  First Amendment Standard

It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979).  "Inmates clearly retain protections afforded by the First Amendment, *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974), including its directive that no law shall prohibit the free exercise of religion." *Id.*  However, it is also well established that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404 (1987).

In *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254 (1987), the Supreme Court established the framework for evaluating the validity of prison regulations that restrict inmates' free exercise rights.  Under *Turner*, such restrictions may be upheld only if they are "reasonably related" to legitimate penological interests.  *Id.* at 89.  *Turner* identifies four factors relevant to the reasonableness determination which the Tenth Circuit has summarized as follows:

> First, the court considers whether there is a logical connection between the prison regulation and the asserted penological interest. Second, the court considers whether alternative means of exercising the religious right in question remain open to inmates.  Third, the court assesses the impact the accommodation of the right in question

> would have on guards, other inmates, and on the allocation of prison resources.  Fourth, the court considers whether any policy alternatives exist that would accommodate the right in question at de minimis cost to the prison.

*Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003)(internal citations omitted).

In applying *Turner's* "reasonable basis" test, courts must give appropriate deference to the expertise of prison authorities.  *Turner*, 482 U.S. at 84.  However, "a reasonableness standard is not toothless" and deference is not a rubber stamp; thus, before acceding to the judgment and discretion of prison administrators, a court should have evidence that their judgment and discretion have been exercised."  *Abbott v. Thornburgh*, 490 U.S. 401, 414 (1989).  Because the reasonable basis test is designed to allow prison administrators to "anticipate security problems," officials can establish a valid, rational connection based on their past experience and intimate knowledge of institutional safety concerns.  An asserted justification must be accepted unless it is "so remote as to render the regulation arbitrary or irrational."  *Turner*, 482 U.S. at 89.  "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation . . . [while] the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."  *Turner*, 482 U.S. at 89-91.

### b.  RLUIPA Standard

In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act (RLUIPA).  *See* 42 U.S.C.A. § 2000cc-1 (West 2010).  RLUIPA provides that "no [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government shows that the burden furthers "a compelling

governmental interest" and does so by "the least restrictive means." § 2000cc-1(a)(1)-(2).

RLUIPA applies to all persons confined to an institution that receives "federal financial

assistance," § 2000cc-1(b)(1), and defines "religious exercise" to include "any exercise of

religion, whether or not compelled by, or central to, a system of religious belief." §

2000cc-5(7)(A). The Tenth Circuit has held that RLUIPA applies in the prison context. *See*

*Ahmad v. Furlong*, 435 F.3d 1196 (10th Cir. 2006). RLUIPA includes an express private cause of

action, which states: "A person may assert a violation of [RLUIPA] as a claim or defense in a

judicial proceeding and obtain appropriate relief against a government." § 2000cc–2(a). For

purposes of this provision, "government" includes, *inter alia,* States, counties, municipalities,

their instrumentalities and officers, and persons acting under color of state law. §

2000cc–5(4)(A).

Under RLUIPA, the plaintiff bears the initial burden of "produc[ing] prima facie evidence

to support a claim alleging a violation of the Free Exercise Clause . . . ." § 2000cc-2(b). To

satisfy this burden a plaintiff must show that he: (1) is engaged in a religious exercise; (2) that

the religious exercise is motivated by a sincerely held belief; and (3) that the exercise has been

subjected to a substantial burden by correctional officers. *See Abdulhaseeb v. Calbone*, 600 F.3d

1301, 1312 (10th Cir. 2010). If the plaintiff satisfies this initial burden, then the burden of proof

shifts to the defendants to show that the substantial burden results from "compelling

governmental interests" and that the government has employed the "least restrictive means" of

accomplishing the compelling interest. § 2000cc-1(a). However, the burden of proof as to

whether the challenged government practice substantially burdens the plaintiff's exercise of

religion remains with the plaintiff.   § 2000cc-2(b).

In a recent case, *Sossamon v. Texas*, 131 S. Ct. 1651 (2011),  the United States Supreme Court held that by accepting federal funding, states do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA.  *Id*. at 1663.  This means that a plaintiff cannot obtain money damages from defendants in their official capacities under RLUIPA without showing an express waiver of sovereign immunity.

Because RLUIPA mandates stricter scrutiny of government actions that burden inmates' religious freedoms than is required under the Free Exercise Clause, as applied by the Supreme Court in *Turner*, the court will first analyze Plaintiff's claims under the RLUIPA framework.[3]  If it finds the evidence here fails to support a claim under RLUIPA's strict scrutiny standard the court will forgo analysis under the less rigorous *Turner* framework.

### V.  RLUIPA Claims

The court has previously found Plaintiff's Complaint and accompanying exhibits sufficient to make out a prima facie showing of a violation of the Free Exercise Clause, thereby shifting the burden of proof under RLUIPA to Defendants.  Thus, the primary issues here are whether Plaintiff's religious practices were substantially burdened by the challenged restrictions, and, if so, whether Defendants used the "least restrictive means" to accomplish a "compelling government interest."

---

[3]  Plaintiff has not presented any evidence showing that the institution where he is confined receives Federal financial assistance.  However, because Defendants do not dispute this point, for present purposes the court will assume that the requirement is satisfied.  If necessary, Defendants may still dispute this at a later time.

17

As the Tenth Circuit has explained, not "every infringement on a religious exercise will constitute a substantial burden." *Abdulhaseeb*, 600 F.3d at 1316.  Instead, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007).

Concerning the compelling interest standard, the Supreme Court has recognized that in enacting RLUIPA, Congress "anticipated that courts would apply [RLUIPA's] standard with due deference to the experience and expertise of prison and jail administrators." *Cutter v. Wilkinson*, 544 U.S. 709, 723, 125 S. Ct. 2113, 2123 (2005) (internal quotations omitted).  Reducing costs, limiting the number of required staff, consolidating vendors, and preventing security risks are all compelling justifications under RLUIPA.  *Abdulhaseeb*, 600 F.3d at 1318; *see also* 146 Cong. Rec. 16698, 16699 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy) (mentioning good order, security, discipline, costs, and limited resources as justifications for placing limits on religious practice); *Sossamon*, 560 F.3d at 334 ("Texas obviously has compelling governmental interests in the security and reasonably economical operation of its prisons . . . .").  Moreover, RLUIPA does not require states to "affirmatively subsidize religion." *Abdulhaseeb*, 600 F.3d at 1320; *see also* 42 U.S.C. § 2000cc-3(c) ("Nothing in this chapter shall create . . . a right of any religious organization to receive funding or other assistance from a government, or of any person to receive government funding for a religious activity . . . .").  However, regardless of the compelling interest at stake, the government must show that it employed the "least restrictive means" available to achieve its stated objective.  *Abdulhaseeb*,

18

600 F.3d at 1320.

      With these standards in mind, the court will address each of Plaintiff's claims for specific religious accommodations under RLUIPA in turn.

### a. Thorshammer Medallion

      Plaintiff asserts that Defendants substantially burdened his religious practice by confiscating his Thorshammer medallion on at least two separate occasions.  Plaintiff alleges that the Thorshammer is "known to be integral to Odinist and Asatru Practice, especially to solitary adherents."  (Compl. ¶ 26.)  In March 2005, Plaintiff had a half-inch diameter silver Thorshammer taken from him while in general population after prison officials summarily instituted a policy banning metallic religious medallions.  Although the new policy merely stated that the item had to be "non-metallic" Plaintiff was told that he could only have a plastic Thorshammer as a substitute.[4]  In May 2006, Plaintiff had a wooden Thorshammer taken from him when we was sent to short-term intensive management in the maximum security section of the prison for disciplinary reasons.  Although Plaintiff was initially deprived of all but one religious item, he was told that he could obtain a plastic Thorshammer once he completed intensive management.  Defendants deny that these incidents substantially burdened Plaintiff's religious practice and contend that the substitution of a plastic Thorshammer is merely an inconvenience which is justified by compelling safety and security concerns.

      Plaintiff contends that plastic is not a suitable substitute because the Thorshammer must

---

    [4]  Despite this injunction it appears Plaintiff was still allowed to have a wooden Thorshammer while in the general population.

be made of a natural substance in order to fulfill its religious function of drawing to the wearer

the powers of the earth.  Plaintiff argues that "a 'plastic Thorshammer' would render the sanctity

of the Thorshammer, the very meaning and relevance of the Thorshammer absolutely

impracticable and meaningless," (Doc. 67 at 21), and that requiring him to wear a plastic

Thorshammer is "akin to asking a Christian to worship the Devil or a Moslem to eat swine,"

(Warner Decl. ¶ 6).  In addition to his own sworn declaration Plaintiff has submitted

documentation from Odinist/Asatru authorities that supports these assertions.  (Doc. 67, Ex. 13.)

Defendants, on the other hand, have not presented any evidence to contradict Plaintiff's

assertions that a Thorshammer is vital to his religious practice and must be made from a natural

substance such as wood or metal.  Thus, the court finds that the challenged restrictions regarding

the Thorshammer impose a substantial burden on Plaintiff's religious exercise.

The burden now rests with Defendants to show that their policies governing

Thorshammers are the least restrictive means of accomplishing a compelling governmental

interest.  Defendants have presented ample evidence that the ban on non-plastic Thorshammers is

motivated by compelling interests in maintaining institutional safety and security.  According to

the declarations of prison officials, small metal objects about the size of a Thorshammer

medallion have often been crafted by inmates into weapons.  (Balls Decl. ¶ 3.)  Such objects have

also been used to unlock handcuffs and to scratch plastic cell-door windows in order to obscure

visibility or make weapons.  (Burr Decl. ¶ 4; Talbot Decl. ¶ 3.)   Moreover, as discussed in more

detail below, wooden objects are largely banned in maximum security because they can easily be

fashioned into weapons or used to circumvent locks.  (Burr Decl. ¶ 5.)  Although Plaintiff asserts

that these concerns are merely "speculative and uncertain anxieties," *see Campos v. Coughlin*, 854 F.Supp 194, 209 (S.D. N.Y. 1994), prison officials are entitled to substantial deference on such matters, which are peculiarly within their area of expertise. *See Pell v. Procunier*, 417 U.S. 817, 826, 94 S. Ct. 2800, 2806 (1974).  Thus, the court finds that the restrictions here are motivated by compelling governmental interests in promoting safety and security.

Turning to the question whether the regulations are the least restrictive means of promoting these interests, the record shows that the total ban on metal Thorshammers throughout the prison is justified given the unique dangers posed by such metal objects.  Although Plaintiff contends that some other metal items are available in the prison, such as eyeglass frames and wedding rings, he has not shown that those items pose the same threat that a metal Thorshammer would.  Moreover, the allowance of a small wooden Thorshammer in the general population areas shows a reasonable effort at accommodation despite the potential safety and security risks involved.  As far as maximum security areas, however, the evidence supports Defendants' position that wooden Thorshammers in those areas would pose an unacceptable risk.  Even accepting Plaintiff's assertion that some other wooden items, such as dominoes or Scrabble tiles, are available in maximum security, Defendants' determination that wooden Thorshammers would pose an unmanageable risk in maximum security areas is entitled to deference.  Plaintiff has not presented sufficient evidence to show that Defendants' concerns are unfounded or pretextual.  That being the case, the allowance of a plastic Thorshammer in maximum security

for those who wish to have one is the least restrictive accommodation available.[5]  Finally, the

restriction to only one religious item while in short-term intensive management is appropriate

given the overriding security concerns and brief time-frames involved.  Thus, the court concludes

that the UDC's policies regulating Thorshammers are narrowly tailored to achieve compelling

governmental interests and do not violate RLUIPA.

### b.  Wooden Runes and Wooden Bowli

Plaintiff challenges the denial of wooden runes and a wooden bowli based on prison

regulations banning wooden objects in maximum security units.  "A wood rune is about the size

of a quarter, and a rune card is approximately the size of a regular playing card.  Runes consist of

a series of symbols that form a non-traditional alphabet used by practitioners of Odinism."

*Borzych v. Frank*, 2010 WL 1026977, at *3 (W.D. Wis. Mar. 17, 2010).  A bowli is a sacrificial

bowl used to hold mead for the blessing or offering during Blot and Sumbel observances.  Again,

Plaintiff has presented sufficient evidence that personal rune use and ceremonies involving the

bowli are central to his sincere religious observance.  Thus, the primary issues here are whether

denial of those items substantially burdens Plaintiff's religious observance and, if so, whether the

accommodations provided are the least restrictive means of achieving a compelling governmental

interest.

---

[5]  Accepting Plaintiff's assertion that use of a plastic Thorshammer would be abhorrent to him, Plaintiff may choose to forego having a Thorshammer altogether while in maximum security.  Plaintiff has not shown that a Thorshammer is so essential to his religious practice that without one he is essentially foreclosed from any possibility of exercising his religion.  Instead, the record shows that, at times, Plaintiff has voluntarily chosen to wear an alternative religious medallion–a sunwheel–rather than a Thorshammer.

Defendants state that allowing inmates to have wooden runes or bowli would present serious safety and security concerns. According to the declarations of prison officials, small wood pieces have been used to jam cell doors and circumvent locking mechanisms. Officer Balls states that he observed this happen on numerous occasions, which precipitated the removal of wood from the craft area. (Balls Decl. ¶ 5.) Officer Burr also states that he has seen an inmate use wood pieces to jam a mechanical lock so that it appeared to be secure, in order to set a trap for an officer. (Burr Decl. ¶ 5.) Officer Burr further states that wooden broom handles are no longer used in the prison because they have been sharpened and used to stab another inmate in the eye. (Burr Decl. ¶ 5.) Thus, the Court finds that the prohibition on wooden runes and bowli are justified by compelling interests in safety and security. Accepting that these restrictions substantially burden Plaintiff's religious observance, the court turns to whether the accommodations provided are the least restrictive means available.

Due to the safety and security concerns with wooden items, the prison has followed the lead of other institutions by allowing inmates to possess a set of rune cards, similar to playing cards, rather than wooden rune sets. Inmates are also allowed to buy plastic bowls through the commissary for use as a bowli. The substitution of rune cards for wooden runes has previously been upheld by this court and others under the Free Exercise Clause. *See Polk v. Patterson*, 2:07-CV-980-TC, 2011 WL 1897798 (D. Utah May 18, 2011) (also upholding plastic bowl as substitute for bowli); *see also Keen v. Noble*, 2007 WL 1080549, at *1 (E.D. Cal. Apr. 04, 2007) (ban on wooden runes supported by legitimate security concerns, rune cards a suitable accommodation). Unlike the Thorshammer, Plaintiff has not presented evidence showing that

23

runes or bowli must be made of a natural substance to be efficacious.[6]   Moreover, there is no

evidence that a less restrictive alternative is available that satisfies relevant safety and security

concerns without imposing significant costs or burdens on the prison.  While Plaintiff again cites

the presence of wooden dominoes and Scrabble tiles within the prison as proof that wooden

items can easily be accommodated, there is no evidence that these items are authorized, and, if

so, how and where.  Thus, Defendants have satisfied their burden of showing that the substitution

of paper rune cards and plastic or paper bowls is the least restrictive means of accommodating

Plaintiff's requests for a rune set and bowli while also serving compelling interests in safety and

security.

### c.  Dietary Accommodations

Plaintiff alleges that he has been denied religious dietary accommodations, including

natural fruit juice (as a substitute for mead used in Blot and Sumbel observances) and fast-boxes

provided as meal substitutes when observing religious fasts.  Plaintiff asserts that denial of these

items substantially burdens his religious practice.  Defendants do not dispute the importance of

fruit juice, or another suitable mead substitute, to Plaintiff's religious observance, but argue that

fruit juice is legitimately banned because it can be turned into alcohol.  Regarding fast-boxes,

Defendants deny that they are necessary for the entire Winter Nights period because Defendants'

---

[6]  Plaintiff states that he is unaware of any religious authority sanctioning use of rune cards or plastic bowls as substitutes, however, he has not submitted any authoritative evidence that such substitutions are prohibited.  Moreover, it is not clear how rune cards, assuming they are made of paper (a natural substance derived from wood), or paper bowls, assuming they could be used instead of plastic, are substantially different from wooden rune tiles or a wooden bowli.

own research found no dietary requirement for the Asatru faith to fast during the entire period.

Defendants further assert that Plaintiff failed to comply with the 45-day written notice

requirement for receiving fast-boxes.

### i. Fruit Juice

Defendants have submitted ample evidence supporting the ban on fruit juice throughout

the prison.  Prison officials have testified to witnessing countless occasions where inmates have

hoarded fruit juice, hidden it in any number of places, and turned it into an alcoholic beverage.

(Balls Decl. ¶ 8; Burr Decl. ¶ 6.)  Defendants further state that intoxicated inmates drastically

increase safety risks and the potential for violence and volatility within the prison.  As a

substitute for fruit juice inmates are given a sugar-free punch that is served with lunch.  (Monson

Decl. ¶ 3.)  Defendants assert that the sugar-free punch is a reasonable alternative to fruit juice

for Plaintiff's religious observance, and is the least restrictive alternative available.

Plaintiff does not dispute that preventing inmates from producing alcohol in the prison is

a compelling governmental interest that is furthered by the ban on fruit juice.  However, Plaintiff

contends that the sugar-free juice is not a suitable substitute and requests extra milk and honey

instead.  Plaintiff has not presented any evidence showing that the sugar-free punch is unsuitable,

nor has he shown that extra milk and honey could be provided at *de minimis* cost or burden to the

prison.  Moreover, the record shows that Plaintiff already has access to milk and honey.  Thus,

the court finds that the denial of fruit juice does not violate RLUIPA.

### ii. Fast-Boxes

Regarding the provision of fast-boxes, Plaintiff has submitted ample evidence to refute

Defendants' assertion that fasting is only necessary for one day of the Winter Nights celebration. Plaintiff's grievance records show that he repeatedly told prison officials that he needed fast-boxes for the entire Winter Nights period.  In response to Plaintiff's grievances Defendant Koehler, the Volunteer and Religious Services coordinator, sent an email on September 18, 2006, to an Asatru expert inquiring "if there are any feasts or fasts that are required to be held by those of the Asatru faith."  (Doc. 67, Ex. 8 at 2.)  On September 21, 2006, Koehler received a response letter from Dale Overman from the Heathen Spirit Hearth explaining the necessity of fasting during the entire Winter Nights period and formally requesting "that all inmates with 'Asatru' or 'Odinist' as their religious preference be given box dinners for each of the 21 nights." ("Overman Letter", Doc. 67, Ex. 8 at 3.)  Included with the letter was a document "outlining the history behind Winter Nights and the dates for the fasting days."  (Id.)  The following year on August 7, 2007, 47 days before the start of the Winter Nights, Plaintiff again filed a grievance requesting fast-boxes for the entire Winter Nights period.  (Grievance #990865621, Doc. 67, Ex. 12 at 32.)  Plaintiff received a written response from Defendant Koehler on August 13, 2007, denying Plaintiff's request and stating that "[i]n our research we have found no dietary requirement for the Asatru faith to fast during the entire time period from September 23, 2007 to October 13, 2007."  ("Koehler Memo", Doc. 67, Ex. 8 at 33.)  While it is not clear what "research" Koehler was referring to, he made no reference to the Overman Letter received the previous year.

The evidence in the record supports Plaintiff's claim that Defendants substantially burdened Plaintiff's religious observance by denying him fast-boxes for the entire Winter Nights

period.  Not only were Defendants aware of the letter from Dale Overman, an expert sought out

by prison staff, they also had ample information provided by Plaintiff to support his request for

accommodation.  Despite this information, however, Defendants determined that fasting

throughout the Winter Nights period was not required.  Defendants have not provided any

justification for this determination.  Moreover, given the fact that inmates of other religions are

provided fast-boxes for extended periods, including Muslim inmates during Ramadan, the record

does not support Defendants' assertion that the denial of fast-boxes to Asatru adherents is the

least restrictive means of achieving a compelling governmental interest.  Thus, Defendants are

not entitled to summary judgment on Plaintiff's RLUIPA claim stemming from the denial of fast-

boxes.

### d.  Prayer/Altar Cloth

Plaintiff alleges that he was denied an altar cloth for use in religious observances.

According to Defendants, the altar cloth, as it's name suggests, is used to drape the altar during

religious rituals.  Even accepting Plaintiff's assertion that the altar cloth is important to his

religious exercise, the record shows that Defendants have provided a reasonable alternative in the

form of an extra towel that can be purchased through the prison commissary.  (Koehler Decl. ¶

25.)  Plaintiff, however, argues that this is not a suitable alternative unless he is able to draw

runes and other symbols or designs on the cloth, and that prison regulations prohibit him from

doing so.  Plaintiff further states that he previously had a cloth with drawings on it confiscated.

Plaintiff's unsupported arguments are not sufficient to refute Defendants' evidence

showing that a suitable alternative is available for use as an altar cloth.  Even accepting

Plaintiff's assertion that prison regulations prevent him from drawing on the cloth, Plaintiff has

not shown that this substantially burdens his religious exercise.  In fact, other courts have found

even a plain washcloth to be a suitable alternative to an altar cloth.  *See Kaiser v. Shipman*, No.

3:07CV229/LAC/EMT, 2009 WL 2423141 at *7  (N.D. Fla. Aug. 4, 2009) ("While Kaiser may

have desired a separate, larger piece of fabric to use as an altar cloth than the item that was

available to him, the court concludes that he has not shown that being denied the cloth of his

choosing caused him to be subject to a deprivation that 'significantly hamper[ed]' his religious

practice.")

Because Plaintiff has not met his burden of showing that Defendants' allowance of an

extra towel in place of an altar cloth substantially burdens his religious practice, Plaintiff

allegations regarding denial of an altar cloth do not support a claim under RLUIPA.

### e.  Additional Accommodations

In the "Request for Relief" section of his Complaint (Compl. ¶ b at 22) Plaintiff mentions

various other accommodations he seeks for his religious practice, including *inter alia*: (1)

Meadhorn, (2) Oath Ring (3) Meditation Drum (Sedhr), (4) pork for observance of Yule, (5)

Rune Staff (Gandr), (6) unspecified accommodations for "Winter Nights," (7) weekly group

study time, and, (8) gatherings for Blot on the nine Holy Days.  Defendants assert that these

requests are not properly before the court because the Complaint does not adequately plead facts

related to each of these items.  Although Plaintiff points out that he does mentions these items in

paragraphs 50 and 51 of his Complaint, those paragraphs contain only general statements and do

not include sufficient facts to make out a prima facie claim for relief as to each item.   Thus,

28

Plaintiff's claims regarding these items are not properly before this court.

### f. RLUIPA Conclusion

The extensive record here does not support a finding that Defendants violated RLUIPA except with regard to the denial of fast-boxes.  Regarding each of the other items addressed above the evidence shows that Defendants acted appropriately based on compelling governmental interests and employed the least restrictive means available to accommodate Plaintiff's religious worship.  Thus, Defendants are entitled to summary judgment on all RLUIPA claims except Plaintiff's challenge to the denial of fast-boxes.  Because Defendants have satisfied RLUIPA's strict scrutiny standard on all other claims the court need not address them under the less rigorous Free Exercise standard. [7]

### VI.  Due Process Claims

Plaintiff alleges that Defendants denied him due process in violation of the Fourteenth Amendment by: (1) imposing a ban on metallic religious items without first notifying inmates (Compl. ¶ 20); (2) confiscating his wooden Thorshammer upon his transfer to IM without prior process (Compl. ¶ 24), and; (3) summarily denying him the opportunity to obtain a Thorshammer while in IM until reaching a higher security classification (Compl. ¶ 25).

The Fourteenth Amendment's procedural due process guarantee "ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that

---

[7]  Having concluded that the denial of fast-boxes during the entire Winter Nights violated RLUIPA's strict scrutiny standard it remains to be determined whether the denial violated the First Amendment standard as set forth in *Turner*.  However, because the parties have not directly addressed this claim in their briefs it must be reserved for further proceedings.

decision." *Kirkland v. St. Vrain Valley Sch. Dist.*, 464 F.3d 1182, 1189 (10th Cir. 2006).  To

make out a procedural due process claim, a plaintiff must show: (1) that he has a constitutionally

protected liberty or property interest that has been interfered with by the state; and, (2) that he

was not afforded an appropriate level of process.  *Couture v. Board of Educ. of Albuquerque*

*Pub. Sch.*, 535 F.3d 1243, 1256 (10th Cir. 2008).  The Supreme Court has recognized that in the

prison context "states may under certain circumstances create liberty interests which are

protected by the Due Process Clause."  *Sandin v. Conner*, 515 U.S. 472, 483, 115 S. Ct. 2293,

2300 (1995).  However, "a deprivation occasioned by prison conditions or a prison regulation

does not reach protected liberty interest status and require procedural due process protection

unless it imposes an 'atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life.'"  *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) (quoting

*Sandin*, 515 U.S. at 484).

     Plaintiff cannot show that the confiscations or denials challenged here amounted to an

atypical and significant hardship in relation to the ordinary incidents of prison life because, as

previously explained, the denials were the least restrictive means of promoting compelling

governmental interests.  Plaintiff clearly does not have a liberty interest in possessing items that

are validly prohibited by prison regulations narrowly tailored to ensure institutional safety or

security.  This is true regardless of the items' religious nature.  Because Plaintiff did not have a

constitutionally recognized liberty interest in having those items, he cannot challenge the

procedures used to deny them to him.  As other courts have recognized, where a prison

deprivation does not implicate protected liberty or property interests "the state is free to use any

procedures it chooses, or no procedures at all" when restricting them. *Montgomery v. Anderson*, 262 F.3d 641, 644 (7th Cir. 2001). "Again, this is not to say that plaintiff was required to abandon his religious beliefs; only that the *due process* clause does not protect a prisoner from interference with the practice of his religion." *Id*. (Emphasis in original.)

Plaintiff's due process claims also fail because he had ample opportunity to challenge the denials through the prison grievance process. The Supreme Court has held that where a pre-deprivation process is impractical, due process can be satisfied by a meaningful post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 532-33 (1994). Although prison regulations do not provide for a pre-deprivation hearing before denial of a requested religious item, as such hearings would be impractical, inmates are permitted to challenge such denials through the prison grievance process. Indeed, the record here shows that Plaintiff pursued each of his requests for religious accommodations through the grievance system and received numerous responses from prison officials. (*Martinez* Rpt., Doc. 44-12.) Thus, Plaintiff received the process that was due.

Plaintiff's claim that his due process rights were violated when prison officials denied him religious items based on his security classification is also without merit. It is well established that prisoners have no right under the Federal Constitution to any specific classification or housing assignment. *See Hewitt v. Helms*, 459 U.S. 460, 468, 103 S. Ct. 864, 869 (1983). Thus, an inmate's classification will implicate a protected liberty interest only where it imposes an "atypical or significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin*, 515 at 485, or threatens to lengthen his term of confinement, *id*. at 487. Plaintiff has not offered any evidence that his classification satisfies either of these requirements.

Moreover, Defendants have submitted ample evidence showing that Plaintiff's heightened

security classification was justified based on his disciplinary history.  (*Martinez* Report, Ex. 11-3;

Doc. 44-3).

Thus, Defendants are entitled to summary judgment on Plaintiff's due process claims.

### VII.  Equal Protection Claim

Plaintiff's Complaint asserts that Defendants violated the Fourteenth Amendment's

equal protection guarantee by favoring other religions over his own.  Plaintiff claims that prison

officials grant American Indian inmates and Islamic inmates religious accommodations that are

denied to Asatru adherents.  Specifically, Plaintiff asserts that American Indian inmates are

allowed to have a medicine bag with stones and pieces of wood similar to rune sets (Compl. ¶

32) and that fast-boxes are provided to Islamic inmates during Ramadan, but have been denied to

Plaintiff during the Asatru Winter Nights  (Compl. ¶ 48).

### a.  Legal Standard

The Equal Protection clause requires that "all persons similarly circumstanced shall be

treated alike."  *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S. Ct. 560, 562 (1920).

An equal protection violation occurs when the government treats someone differently from

another person who is similarly situated, without adequate justification for the difference in

treatment.  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Jacobs,*

*Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1118 (10th Cir.1991).  However, a

plaintiff alleging an equal protection violation must present specific facts which demonstrate that

a discriminatory purpose was a motivating factor in the decision attacked by the complaint.

*Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir .1988).  "'Discriminatory

purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It

implies that the decision maker . . . selected or reaffirmed a particular course of action at least in

part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

   The Supreme Court has held that "the standard of review adopted in *Turner* applies to all

circumstances in which the needs of prison administration implicate constitutional rights."

*Washington v. Harper*, 494 U.S. 210, 224, 110 S. Ct. 1028, 1038 (1990); *see Turner v. Safley*,

482 U.S. 78 (1987).  This includes Equal Protection claims filed by prisoners.  *Patel v. Wooten*,

15 Fed. Appx. 647, 650 (10th Cir. 2001).  Thus, in the prison religious context, equal protection

does not require "that every religious sect or group within a prison—however few in

numbers—must have identical facilities or personnel."  *Cruz v. Beto*, 405 U.S. 319, 322, 92 U.S.

1079, 1081 (1972).  Instead, prison officials must only ensure that an inmate of a minority

religion enjoys "a reasonable opportunity of pursuing his faith comparable to the opportunity

afforded fellow prisoners who adhere to conventional religious precepts."  *Id*.  This standard

gives deference to prison administrators to determine which groups will be allowed to operate

within the prison population.  *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S.

119, 136, 97 S. Ct. 2532 (1977).  When faced with "the decision as to which of many groups

should be allowed to operate within the prison walls, where, confronted with claims based on the

Equal Protection Clause, the courts should allow the prison administration the full latitude of

discretion . . . ."  *Id.*  Nothing in the Constitution requires prison officials to treat all inmate

groups alike, particularly when differentiation is necessary to avoid disruption or violence.  *Id.*

### b.  Sufficiency of Plaintiff's Evidence

### i.  Rune Sets

The record here does not support the conclusion that the allowance of medicine bags for

American Indian inmates and denial of rune sets to Asatru adherents is motivated by purposeful

discrimination.  Instead, Defendants have shown that the different treatment of medicine bags

and rune sets is based on legitimate security concerns.  According to the Declaration of Craig

Burr, the medicine bags allowed to Native American inmates are small in size, approximately

two to three inches around, and are worn as a medallion around the neck.  (Doc. 48, Burr Supp.

Decl. ¶ 7.)  Only certain items are approved to be in the bag, including: sage leaf, small roots and

stones.  (Burr Supp. Decl. ¶ 12.)  The items are small enough in size to be poured onto a

handkerchief and easily inspected by prison officials upon request.  (Burr Supp. Decl. ¶ 12.)

Moreover, the stones are about the size of a pea and the small roots are soft and pliable and could

not be sharpened into a weapon or used to disable a lock. (Burr Supp. Decl., ¶¶ 13, 14, 16.)

Based on these characteristics prison officials have determined that, unlike runes, medicine bags

do not pose significant safety or security risks.  Plaintiff has not refuted Defendants' evidence

concerning the medicine bags, nor has he shown that Defendants' evaluation of the threat posed

by medicine bags, as compared to rune sets, is irrational or specious.  Thus, Plaintiff cannot make

out an equal protection claim based on the denial of rune sets.

### ii.  Fast-Boxes

Plaintiff has presented sufficient evidence to support the conclusion that the denial of

fast-boxes was motivated by purposeful discrimination against the Asatru religion.  As discussed

in section V.b.ii above, the record shows that as early as September 2006 Defendants had

sufficient information to believe that Asatru adherents required fast-boxes for the entire Winter

Nights observance.  The record also shows that fast-boxes are provided for extended periods to

inmates of other religions, including Islamic inmates observing Ramadan.  Despite these facts,

however, and in the face of repeated requests from Plaintiff supported by authoritative

information, Defendants inexplicably determined that fast-boxes would only be provided to

Asatru adherents for one day of the Winter Nights period.  The court finds this evidence

sufficient to support the conclusion that the denial of fast-boxes for the entire Winter Nights

period was motivated by bias against the Asatru faith.  Thus, Defendants are not entitled to

summary judgment on Plaintiff's equal protection claim stemming from the disparate provision

of fast-boxes for religious observances.

### VIII.  Free Speech Claims

#### a.  Legal Standard

It is well established that "convicted prisoners do not forfeit all constitutional protections

by reason of their conviction and confinement in prison."  *Bell v. Wolfish*, 441 U.S. 520, 545, 99

S. Ct. 1861, 1877 (1979).  Instead, "a prison inmate retains those First Amendment rights that are

not inconsistent with his status as a prisoner or with the legitimate penological objectives of the

corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 2806 (1974).  In the

free-speech context the Supreme Court has held that prison officials violate the First Amendment

when, for reasons unrelated to legitimate penological interests, they engage in "censorship of . . .

35

expression of 'inflammatory political, racial, religious, or other views,' and matter deemed

'defamatory' or 'otherwise inappropriate.'"   *Procunier v. Martinez*, 416 U.S. 396, 415, 94 S. Ct.

1800, 1813 (1974).

In *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987), the Supreme Court

held that prison regulations that impinge upon inmates First Amendment rights are valid only if

they are "rationally related to legitimate penological objectives."   The *Turner* Court articulated

four factors that should be considered in determining the constitutionality of a prison's

restrictions on speech, namely: (1) whether a valid, rational connection exists between the

regulation and the government interest it protects; (2) whether prisoners have alternative means

of exercising the protected right; (3) the impact of accommodating the right on other inmates,

guards, and the allocation of prison resources generally; and (4) whether alternatives exist that

fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.   *Turner*,

482 U.S. at 89-90.

### b.  Intensive Management

Plaintiff alleges that Defendants violated his First Amendment free speech rights by

denying him books while in short term intensive management ("IM").   The record shows that on

February 25, 2005, following his involvement in an assault and battery incident, Plaintiff was

moved to the IM section of the Uinta 1 maximum security unit.   Plaintiff remained in IM until

mid-April when he was moved to the less restrictive Section 5 of Uinta 1.   Inmates in short term

IM are subject to severe restrictions on their personal property, and may only have four soft-

covered books.   (Policy Fdr 25/03.08M, Doc. 44-10.)   When inmates are moved to long term IM

36

they are allowed to have ten books.  (Policy Fdr 25/04.05L, Doc. 44-10.)  Any item that could be

fashioned into a weapon or used for self-harm is not allowed until housing management has had

time to monitor the inmate and make a determination as to the best housing option for them.

Relinquishment of personal items back to an inmate depends on where he is moved.  (Anderson

Decl. ¶ 4, Doc. 44-1.)  The rationale for restricting property in IM is that inmates who have

demonstrated certain behaviors, such as "threatening the safety, security or control of the

institution," require appropriate management.   (Policy Fdr 25/04.05L, Doc. 44-10.)

Plaintiff's evidence does not support a First Amendment claim based on denial of books

while in intensive management.  Application of the *Turner* factors shows that the book

restrictions in IM are rationally related to legitimate penological objectives.  Strict property

limitations are necessary in IM to ensure safety and security while evaluating inmates who have

committed serious disciplinary violations.  Moreover, despite the severe restrictions, inmates are

not stripped of all reading materials but are allowed to retain up to four soft covered books (ten in

long-term IM).  Allowing inmates to retain the usual number and types of books in IM would

vastly increase the burden on prison staff charged with strictly supervising problem inmates and

would undermine the valid objectives of IM.  Finally, it does not appear that there are any

alternatives to the book restrictions that would fully accommodate inmates rights with only *de

minimis* impact on safety, security and prison resources.  Thus, Defendants are entitled to

summary judgment on this claim.

### c.  Count VIII of Complaint--National Vanguard Press

Plaintiff also alleges in Count VIII of his Complaint that Defendants violated the First

Amendment by imposing a blanket ban on all publications from National Vanguard Press

("Vanguard").  Plaintiff states that he ordered a religious book from Vanguard entitled "Gods and

Myths of Northern Europe," by H.R. Ellis Davidson, but the item was summarily rejected  and

returned to Vanguard under a "blanket ban" imposed by Defendants.  Plaintiff wrote to Vanguard

requesting a refund but never received a response.

     The record supports Plaintiff's claim that Defendants rejected a book sent to him merely

because it came from National Vanguard Press.  In response to his initial grievance about the

incident Plaintiff received a Level I response stating that "[t]he book was denied per a memo

dated April 4, 2006" and that "[t]he Property staff was following policy when they returned the

book." (Doc. 70, Ex. 2 at 7.)   Plaintiff appealed this decision and received a Level II grievance

response from Defendant Casper stating: "Department administrators determined the books;

magazines and other publications from National Vanguard and Resistance pose a threat to the

safety, security, management and control of the institution.  No publication from National

Vanguard will be allowed for inmate retention."  (Doc. 70, Ex. 2 at 5.)  Finally, Plaintiff appealed

this determination to the highest level of the grievance process and received a Level III response

from Defendant Anderson, a senior grievance hearing officer, stating:

> I find your grievance to be without merit.  The fact that you failed to
> follow policy and could have ordered this book through DIO's
> primary vendor negates any claim concerning "National Vanguard."
> Today, if you have the funds, you could still order the book through
> UCI.
>
> The department has determined that National Vanguard's primary
> purpose is to distribute racist and hate publications and materials and
> *will not accept anything from them*.  Publications they may have that

38

> are not racist or hate orientated, such as the book in question in this
> grievance, can be obtained through normal channels.

(Doc. 70, Ex. 2 at 2, emphasis added.)

Conceding that a "blanket ban" on Vanguard would be unconstitutional, Defendants
assert that the grievance responses merely misstated UDC policies regarding screening of books
from Vanguard.  According to the Declaration of Steven Turley, all reading materials, regardless
of their source, are closely reviewed for inappropriate content (except those known to always
contain it, such as pornographic magazines).  Turley further states that, to the extent staff
misinterpreted UDC policies as imposing a blanket ban on certain publishers, that practice has
been corrected.  Finally, Defendants point out that the book Plaintiff sought was available from
the prison's approved vendor, UCI, and that the mishandling of Vanguard publications did not
prevent Plaintiff from obtaining the three books essential to his religious practice (prose Edda,
poetic Eddas and Heimskringle).  Thus, Defendants assert that Plaintiff has not met his burden of
showing that he was denied any book in violation of the First Amendment.

Contrary to Defendants' assertion, Plaintiff has presented sufficient evidence to show that
Defendants imposed a blanket ban on publications from Vanguard in violation of the First
Amendment.  Although Defendants argue that the ban resulted from a misinterpretation of prison
policies by certain staff, and that the misunderstanding has been corrected, those facts do not
justify summary judgment for Defendants on this claim.  As Plaintiff points out, the record shows
that prison officials at all levels of the grievance process enforced a blanket ban on Vanguard
publications as a matter of prison policy and that the ban resulted in rejection of Plaintiff's book.

Morever, Defendants have effectively conceded that the ban was unconstitutional.  Despite these facts, however, Defendants contend that "no injunctive relief is called for, and damages should not be available to Plaintiff, either under RLUIPA or the First Amendment, since Plaintiff has failed to take simple, available steps to obtain the [rejected] book."  (Doc. 70 at 4.)  This argument seems to miss the point.  Because Plaintiff is suing to vindicate the alleged violation of his constitutional rights, not merely to obtain the book, summary judgment is not warranted simply because Plaintiff's request for injunctive relief may be moot.  Plaintiff may still be entitled to declaratory relief and some form of damages based on the violation of his constitutional rights.  Thus, Defendants' Motion for Summary Judgment on Count VIII of the Complaint is denied.

## ORDER

Based on the foregoing analysis, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Partial Summary Judgment (Doc. 55) is **DENIED IN PART** as to Plaintiff's First Amendment and RLUIPA claims stemming from the denial of fast-boxes, and **GRANTED** in all other respects;

(2) Defendants' Motion for Summary Judgment on Count VIII of the Complaint (Doc. 69) is **DENIED**; and,

(3) Plaintiff may file a motion for summary judgment on his remaining claims within twenty-eight days from the date of this order.

DATED this 27th day of October, 2011.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge